[No. 1610.]

## D. W. MAY *v.* THE STATE.

1. "SWINDLING," as defined by the statute (Penal Code, Article 790), "is the acquisition of any personal or movable property, money, or instrument of writing conveying or securing a valuable right, by means of some false or deceitful pretense or device, or fraudulent representation, with intent to appropriate the same to the use of the party so acquiring, or destroying or impairing the rights of the party justly entitled to the same."

2. SAME.—The offense of swindling, as defined by the statute, may be committed in either of two ways: First, where the unlawful acquisition is accomplished by the means named, and the intent is to appropriate the property so acquired to the use of the party so acquiring. Second, where the unlawful acquisition is accomplished by the means named, with the intent of destroying or impairing the rights of the party justly entitled to the property.

3. SAME.—That the two intents—in the one case to benefit himself, and in the other to injure the rights of some one else—and the two modes of accomplishing the crime may combine in a single act, is true, but it is not necessary to the completeness of either mode that they should.

4. SAME.—It follows, from a proper construction of the statutes upon the subject, that the crime of swindling may be committed without destroy-

ing or impairing the rights of the party justly entitled to the property, and that, in fact, it may be perpetrated upon one who is not even justly entitled to the property; wherein is an important distinction, as affecting the question of intent, between swindling and theft

5. SAME—PLEADING—OWNERSHIP.—The statute is general that "where one person owns the property, and another person has the possession, charge or control of the same, the ownership may be alleged to be in either." This rule is not confined to any particular offense, but applies generally to all indictments wherein allegations of ownership are neces sary; and under it it is *held* that an indictment for swindling may allege the ownership to be in one who has charge, possession and control of the property, though he has, in fact, no title, or even beneficial interest in it. An employee having charge and control of his employer's safe and funds has such an ownership.

6. SAME—CHARGE OF THE COURT—VARIANCE.—Under the rules above stated the court did not err in charging the jury, with regard to possession, in the language of Article 426, Code of Criminal Procedure; nor was there variance between the allegation and proof of ownership.

7. SAME—EVIDENCE.—The swindle was perpetrated by means of a draft. The indictment, in setting out the draft, ignored an endorsement thereon, as it appeared on the draft itself. The draft was objected to as evidence because of this assumed variance. *Held*, that the endorsement was but an extrinsic and irrelevant writing, creating no variance, and was properly omitted.

8. PRACTICE—EVIDENCE.—The rules of evidence known to the common law of England, both in civil and criminal cases, govern in criminal actions in this State, except when in conflict with statutory provisions. It is further provided by our Code of Criminal Procedure that the rules of evidence prescribed by statute in civil suits shall, so far as applicable, govern in criminal actions when not in conflict with the Penal Code or the Code of Criminal Procedure.

9. SAME.—There is no criminal statute of this State which regulates, *pro* or *con*, the admissibility in evidence of a notarial act of protest of a draft made by a notary public of another State, but, under Article 2254 of the Revised Statutes, the certificate of such protest is *held* admissible. See the opinion *in extenso* on the subject.

10. SAME.—Objection to a certificate of protest of a draft, made by a notary public of another State, as evidence in a criminal trial in this, because it would work an evasion of the constitutional right of the defendant to be confronted with the witness against him, is untenable, in view of the accepted doctrine that "the rule that the prisoner shall be confronted with the witnesses against him does not preclude such documentary evidence to establish collateral facts as would be admissible under the rules of common or statutory law."

11. SAME.—Whilst the certificate of protest was admissible, it was admissible for the one purpose of proving protest of the draft, and was evidence of no other issue in the case. Having admitted it in evidence, it was the duty of the trial court to instruct the jury as to the extent it was to be considered as evidence.

APPEAL from the District Court of McLennan. Tried below before the Hon. B. W. Rimes.

This conviction was for swindling. The indictment alleged, in substance, that the defendant obtained from C. H. Jones, upon a draft drawn by himself against Steele & Price, Chicago, Ill., the sum of fifty dollars, by means of false representations, to wit: that he, the defendant, was the authorized advertising agent of Steele & Price, and that Geo. W. Cleveland told him, defendant, that such draft would be paid by his, said Cleveland's, firm, and directed him, defendant, to tell said Jones to pay it. A term of three years in the penitentiary was the penalty awarded.

C. H. Jones was the first witness for the State. He testified that he first saw the defendant in Cleveland & Cameron's establishment on North Fourth street in Waco, Texas, on or about November 21, 1883. The witness had no conversation with the defendant on that occasion, but saw him talking with George W. Cleveland of the firm named. He next saw the defendant on the morning of November 22, 1883, at Cleveland & Cameron's place of business, talking with Cleveland. Witness was in an adjoining room and did not hear what was said. Defendant presently left Cleveland, came to the office in which the witness was, asked for a blank check, received it, and went into Mr. Cleveland's office, which was separated from the witness by a glass partition, and there sat down at a table, filled up the check and handed it to witness. It was a check on Steele & Price for fifty dollars. As he handed the check to the witness he stated that he wanted the money in gold coin; as he wanted to place it in the show case of Kaeft & Stolts, as an advertising medium to the ladies of Waco for the best bread, biscuit or cake that could be made from Steele & Price's baking powders; and further said that George W. Cleveland told him that witness could cash the draft. Witness took the draft, and, holding it in his hand, arose from the chair and looked at Cleveland as though he was going to speak to Cleveland about it, when the defendant said: "I don't want the money now; you may keep the check until I call for the money." He returned later in the day and asked for the money. Witness gave him two twenty dollar gold pieces and one ten dollar silver certificate, telling him that he could get the certificate changed into gold at the bank. The fifty dollars given the defendant by the witness was the property

of Cleveland & Cameron. Witness was book keeper for Cleveland & Cameron, and had charge of their money.

After office hours on the same day witness was at the Pacific hotel, and ascertained that the defendant had registered at that hotel as "D. W. Hill." By this fact the suspicions of the witness were aroused as to the responsibility of the defendant, and he immediately sought him. Finding him, witness told him that he had registered at the hotel as Hill. Defendant in reply said: "Yes; Hill is the name of my step-father, and I sometimes assume his name." Witness was not satisfied with this explanation, and requested the defendant to go with him to the house of Cleveland & Cameron. He readily consented, and went without objection or resistance. Arrived there, the witness left defendant in the store and called Cleveland into the office, and commenced telling him about defendant registering his name as Hill, at the Pacific Hotel, and, while doing so, Mr. Cameron cried out: "Your man is gone."

After the witness told the defendant that he had ascertained that he, defendant, had registered at the hotel as Hill, but before asking him to go to Cleveland & Cameron's office, defendant said that he was all right, and proposed that if witness would go with him to his room he would satisfy witness. This the witness declined to do. Defendant then proposed to go to the telegraph office and telegraph for proof. Witness went with him to the telegraph office, and defendant commenced writing a telegram, addressed to Steele & Price, asking: "Is D. W. May all, etc.," when witness told him it made no difference, to go with him to Cleveland & Cameron, which he willingly did.

Upon cross-examination the witness said that he had stated all of the conversations between himself and defendant upon the occasions of the presentation and the payment of the draft, and reiterated that the money belonged to Cleveland & Cameron.

Upon his re-examination, the witness said that Cleveland was not at his business house when he, witness, cashed the draft, but was attending the trial of a case in which he was interested, then in progress at the court house in Waco. Witness further stated that he had the only key to the safe, and the combination. In connection with the evidence of this witness, the State introduced the check, which reads as follows:

"Cleveland & Cameron.
"WACO, TEXAS, Nov'r 22, 1883.
"Pay to the order of Cleveland & Cameron fifty dollars, value received, and charge the same to the account of
"D. W. MAY.
"To Steele & Price,
"108 & 110 Randolph St., Chicago.
"$50.00."

The following endorsement was written across the face of this instrument: "Protested for non-payment, Nov'r 26, 1883. James P. Lowe, Notary Public." The witness identified the said check, or draft, as the one which he first received from the defendant, and on which he paid the defendant fifty dollars, and which, subsequently, he received from the Waco State Bank with endorsements written across it, in red ink, as follows:

"Cleveland & Cameron.
"Pay to W. E. Lowe, Cash'r, or order, for account of Waco State Bank, Waco, Texas. C. M. Seley, P't."

Then followed the certificate of protest, signed by James P. Lowe, Notary Public, city of Chicago, county of Cook, State of Illinois, with notarial seal attached, which was read in evidence.

George W. Cleveland was the second witness for the State. He testified that he was the senior member of the firm of Cleveland & Cameron, wholesale grocery merchants, of Waco. Witness first saw the defendant on the twenty-first or twenty-second day of November, 1883. He came into witness's office and represented himself as the agent of Steele & Price, of Chicago. Witness told him that he did not wish to buy of him, as he had already bought, of Rose, an agent of Steele & Price. Defendant then said that he was thinking how best to advertise Steele & Price's baking powders, and had decided upon the scheme of offering a premium in gold to the lady in Waco who would make the best bread or biscuit. Witness told the defendant he thought the plan a good one. Witness knew Steele & Price, and had bought goods of them. The defendant walked into the private office of the firm, where the book keeper, Jones, was, and the witness, having business at the court house, left.

Just before night, on the same day, while witness was at his

store, Jones came in with the defendant, and told witness that there was something crooked about defendant; that he, Jones, had found the defendant registered at the Pacific Hotel as "D. W. Hill;" that defendant had drawn a draft on Steele & Price as "D. W. May," for fifty dollars, which he, Jones, had cashed. Witness and Jones then went into the private office, leaving the defendant with Cameron and another. Soon Mr. Cameron called out: "Your man is gone." Witness ran up Austin street, but could not find the defendant. Witness then notified the police authorities, and went to the Houston and Texas Central railway depot, and telegraphed concerning the defendant. He saw no more of the defendant until the latter was brought back by constable Joe. Ellison. Cleveland & Cameron never recovered the fifty dollars.

Cross-examined, the witness said that he was very busy when interviewed by the defendant on the morning of November 22, 1883, and could not remember all he said to the defendant. His recollection was that he told the defendant that he could leave his check for forty dollars for collection from Steele and Price. He did not know that he did not tell the defendant that his book keeper, Jones, would or could cash it, or that it would be cashed by the firm of Cleveland & Cameron, and he did not direct Jones to cash it. When the defendant called on witness, at his office, he told witness that he met witness in New Orleans, the previous February. Witness had no recollection of a previous meeting. The defendant disclosed his advertising scheme to witness, and said that he would leave his check on Steele & Price for collection, and would have the drawing of the premiums to take place after collection, by the twenty-seventh or twenty-eighth of November. He showed the witness his advertisements in the "Examiner" and the "Day;" for one of which he said he had paid ninety dollars, and for the other one hundred and twenty, and he exhibited receipts therefor.

J. T. Ellison testified, for the State, that about the third day of December, 1883, he went to Bryan, with a warrant for the arrest of the defendant. He found him in the Brazos county jail, and brought him back to Waco.

Mr. Stolte, of Koeft & Stolte, bakers, testified that on or about November 21 or 22, the defendant came into their place of business, and said that he wanted to advertise Steele & Pierce's baking powders, by depositing money in witness's show case, to be paid to the person who would compound the best loaf of

bread or biscuit. Later in the day, defendant returned and deposited one twenty dollar gold piece, a currency bill and some silver, in all about fifty dollars. That money was afterwards withdrawn, but by whom the witness only knew by hearsay.

William Cameron, of the firm of Cleveland & Cameron, testified that he was in his store on the evening of November —, 1883, when Jones and the defendant came into the store. Soon after Cleveland and Jones withdrew into the office, the defendant "skipped out," ran up Fourth towards Austin street. Witness called out: "Your man is gone." Cleveland followed in the direction the defendant went.

The motion for new trial raised the questions discussed in the opinion, arraigned the action of the court in refusing requested charges, and denounced the verdict as unsupported by the evidence.

*Clark & Dyer* and *Herring & Kelly*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. "Swindling," as defined by our statute, is "the acquisition of any personal or movable property, money, or instrument of writing conveying or securing a valuable right, by means of some false or deceitful pretense or device, or fraudulent representation, with intent to appropriate the same to the use of the party so acquiring, or of destroying or impairing the rights of the party justly entitled to the same." (Penal Code, Art. 790.)

It seems to us clear from this definition that the offense may be committed in either of two ways.

1. Where the unlawful acquisition is accomplished by the means named, and the intent is to appropriate the property so acquired to the use of the party so acquiring.

2. Where the unlawful acquisition is accomplished by the means named, with the intent of destroying or impairing the rights of the party justly entitled to the property. This construction is to our minds borne out by Article 793, which reads: "It is not necessary, in order to constitute the offense of swindling, that any benefit shall accrue to the person guilty of the fraud or deceit, nor that any injury shall result to the persons intended to be defrauded, if it is sufficiently apparent that there was a willful design to receive benefit or cause an injury." In

the one case the intent of the party is to benefit himself; in the other to injure the rights of some one else. It is true that the two intents and two modes of accomplishing the crime may combine and occur in the perpetration of a single act. That they should, however, is not necessary to the completeness of either of the two modes.

It follows, then, that the crime may be committed without destroying or impairing the rights of the party justly entitled to the property, and the swindle may be perpetrated in fact upon one who is not even justly entitled to the property. And this is an important distinction between swindling and theft. In the latter crime the two intents must combine, viz., to deprive the°owner of the value of the property, and to appropriate it to the use or benefit of the taker.

Again, with regard to the allegation of ownership of property, the statute is general that "where one person owns the property and another person has the possession, charge or control of the same, the ownership may be alleged to be in either." (Code Crim. Proc., Art. 426.) This rule is not confined to any particular offense, but is prescribed for indictments generally where an allegation of ownership is necessary. Under this rule a party who has either the "possession," "charge," or "control" of the property has sufficient ownership to sustain a prosecution for an offense involving ownership, where the statute creating the particular offense does not require other evidence of ownership. It has not done so in "swindling," and with regard to that offense we hold that the alleged owner need have no right, title or even beneficial interest in the property, so that he has the possession, charge or control thereof.

In the case before us, Jones, the alleged owner, was the book keeper of Cleveland & Cameron, and had charge of their safe; "had the only key to the safe and the combination of it." Under such circumstances we think it might well be said that he had the charge and control of the safe, and that the money therein contained was in his charge, control and possession. The court did not err in charging the jury with regard to the possession in the language of Article 426, above quoted; nor is there a variance between the allegation and proof as to ownership.

A bill of exceptions was reserved to the action of the court in allowing, over objections of defendant, the draft which was read in evidence to the jury. Several grounds of objection were

urged to this testimony. One was for variance because an endorsement appeared on the note or draft offered in evidence, which was not set out as part of the draft in the indictment. We see no reason why the same rule which obtains in forgery should not hold in swindling, where the offense was committed by means of a false draft or note. In *Labbaite* v. *The State*, 6 Texas Court of Appeals, 257, the objection was that the endorsement on the note offered was not set out in the indictment, and it was held, upon the strength of numerous authorities which are cited in the opinion, "that the endorsement was but an extrinsic and irrelevant writing, creating no variance, and that the evidence was properly admitted." (See, as an additional authority, *Miller* v. *The People*, 52 N. Y., 304.)

In connection with the note, the prosecution was also permitted to read in evidence the notarial act of protest of the draft, made by James P. Lowe, notary public in the city of Chicago, county of Cook, State of Illinois. Three objections are urged:

"1. Because the certificate of protest of a foreign notary public is not recognized by the laws of Texas.

"2. Because by such evidence the State proposed to prove that defendant was not the agent of Steele & Price; and

"3. Because the admission of such testimony, for such a purpose, was an evasion of the constitutional right of defendant to be confronted with the witnesses against him."

It is provided in our Code of Criminal Procedure that (Article 725) "The rules of evidence known to the common law of England, both in civil and criminal cases, shall govern in the trial of criminal actions in this State, except where they are in conflict with the provisions of this Code or of some statute of this State." And again (Article 726): "The rules of evidence prescribed by the statute law of this State in civil suits shall, so far as applicable, govern also in criminal actions when not in conflict with the provisions of this Code or of the Penal Code." We have no provision of either of these Codes upon the subject under discussion; consequently we must revert to the civil statutes for such rules as they may prescribe. By article 2254 of the Revised Statutes, it is expressly provided that, "all declarations and protests made, and acknowledgments taken, by notaries public, and certified copies of their records and official papers, shall be received as evidence of the facts therein stated, in all the courts of this State."

For the sake of the argument it may be admitted that there

was no rule of evidence known to the common law of England which would render this certificate admissible as evidence under Article 725, *supra.* (1 Whart. Ev., 2 Ed., sec. 123.) If admissible at all, we think authority for its admission must be derived from our own statutes. (Article 726, Code Crim. Proc. and Art. 2254, Rev. Stats.) And independently of these statutes it is well settled that "by the law merchant demand, presentment and dishonor of a *foreign* negotiable bill of exchange (that is one payable without the State) can be proved for the purpose of charging the drawer or endorser only by protest, and no part of these facts can be proved by extrinsic evidence." (Abbott's Trial Ev., 425.) Mr. Wharton says, "by the law merchant in respect to foreign negotiable paper * * * the original protests, or duly certified copies when proved by the notarial seal, are *prima facie* evidence of demand and protest." But he says "the protest" cannot "be stretched to make it evidence of any collateral facts which it does not specifically aver, unless such facts are involved in facts which are averred." (1 Whart. Ev., sec. 123.) In some of the States, it is true, it has been held that certificates of protests as to presentments of notes for payment out of the State are not admissible as evidence even in civil cases. (*Dutch Co. Bank* v. *Ibbottson*, 5 Denio, 110; *Schoneman* v. *Falgley*, 7 Pa. St., 433; *Coleman* v. *Smith*, 26 Pa. St., 255.) Such, however, is not believed to be the rule in Texas. Our statute certainly makes no distinction between inter-state and foreign notarial acts, and the practice with us is believed to be uniform to give faith and credit to such official acts or certificates made in or outside the State, if they are in conformity with the local law.

We see no reason why the certificate in question, under our statutes and practice, was not admissible in evidence. As to the objection that its admission was in contravention of the constitutional guarantee that the accused must be confronted with the witnesses against him, the better doctrine, now well settled, is "that the rule that the prisoner shall be confronted with the witnesses against him, does not preclude such documentary evidence to establish collateral facts as would be admissible under the rules of common or statutory law." (*Rogers* v. *The State*, 11 Texas Ct. App., 608, and authorities there cited.) In *The People* v. *Jones*, the Supreme Court of Michigan says: "We do not think the provision of the Constitution securing to the defendant in a criminal prosecution the right to be con-

fronted with the witnesses against him can apply to the proof of facts in their nature essentially and purely documentary, and which can only be proved by the original, or by a copy officially authenticated in some way, especially when the fact to be proved comes up collaterally." (24 Mich., 215.)

But, whilst we hold that the certificate was properly admissible in evidence, it was simply admissible, and could only "be received as evidence of the facts therein stated." The fact that the draft was "protested," was a circumstance to be weighed by the jury, in connection with the other facts in the case. Nothing more than that it was protested after demand upon and refusal to pay, by Steel & Price, is recited in the certificate. It could not and did not prove that the defendant was not the agent of Steele & Price. It was not even conclusive that they had no funds of defendant in their hands. We can well imagine, as is insisted by counsel, how the jury, without being otherwise instructed, would, and likely did, construe the certificate into proof of both these important facts. Having admitted the evidence, the court should by proper instructions have limited its effect and the extent to which the jury were authorized to consider it as evidence in the case. One of the objections urged to its introduction was, that it was proposed to prove by it that defendant was not, as he had represented, the agent of Steele & Price, and this fact, together with the refused counter-charge upon the same subject, were sufficient, to say the least of it, to call the attention of the court pertinently to the necessity of appropriate instructions upon this point.

Because the court erred in failing to instruct the jury upon this important phase of the case, the judgment is reversed and the cause remanded.

*Reversed and remanded.*